# Northup v. Hall, Appellant.

*Equity—Cancellation—Deed—Fraud—Undue influence.*

Where a woman seventy-nine years of age, six months prior to her death, executes a deed of real estate to two of her nieces, retaining control thereof during her own lifetime, in consideration of a home and support for the remainder of her life in the old homestead where she was born and reared, which homestead was owned by the two nieces and their sister, such deed will not be canceled where the evidence

shows that the purpose of the grantor was to secure a home for herself in the old homestead and the enjoyment of her property by the two favored nieces after her death, and that the deed was prepared by her own attorney at her instance, and without any compulsion, duress or misrepresentations upon the part of the grantees.

Argued Feb. 22, 1910.  Appeal, No. 37, Jan. T., 1910, by defendants, from decree of C. P. Lackawanna Co., May T., 1908, No. 1, on bill in equity in case of E. J. Northup et al. v. Lephe A. Hall et al.  Before Fell, C. J., Brown, Mestrezat, Potter and Moschzisker, JJ.  Reversed.

Bill in equity for cancellation of a deed.  Before New-comb, J.

The facts are stated in the opinion of the Supreme Court.

The court found the following conclusions of law:

2. But the fact that Mr. Davidson believed the receipt did not have that effect, coupled with the knowledge that the grantor claimed it was not at the time so intended by her, goes to the good faith of the transaction, and is pertinent as showing that the ostensible consideration moving to the grantor was assumed for the benefit of the defendants and to the grantor's prejudice.  As such it was an apparent, rather than a real consideration.

6. The evidence is insufficient to satisfy the conscience of the court either that the grantor got, or was by defendants intended to get, any real consideration for the deed; or that in other respects the transaction is free from suspicion that unfair advantage was taken of her.

7. On the contrary, the evidence warrants the conclusion that her credulity was imposed upon in respect to the alleged impending sale of the homestead, and that she conveyed her property because she had been adroitly deceived into the false apprehension that it was inevitable as the only means of saving her home.

8. This is decisive of the issue against the defendants.

9. The plaintiffs are, accordingly, entitled to a decree to the effect that defendants hold title under the deed in question as trustees ex maleficio to the use of the grantor's heirs at law.

10. In order that complete relief be had it should be decreed that the deed be surrendered for cancellation.

11. The defendants should pay the costs.

The court entered a decree canceling the deed.

*Errors assigned* among others were (6–12) the conclusions of law as above; (14) the decree canceling the deed.

*H. A. Knapp*, of *Willard, Warren & Knapp*, with him *C. B. Little*, for appellants.—The law is free from difficulty. It is all found in the case of Brink v. Brady, 224 Pa. 116, in which case the validity of a will was in question.

In the case at bar the instrument in question expresses the true desires of the grantor. It served to effectuate her two most cherished desires, to wit, a home for herself at the old homestead and the enjoyment of her property by her favored nieces after her decease: Darlington's Est., 147 Pa. 624; Greenfield's Est., 14 Pa. 489.

*George Morrow*, with him *W. N. Leach*, for appellees, cited: Yardley v. Cuthbertson, 108 Pa. 395; Ringrose v. Ringrose, 170 Pa. 593; Dreisbach v. Serfass, 126 Pa. 32; Davis v. Martin, 8 Pa. Superior Ct. 133; Miskey's App., 107 Pa. 611.

OPINION BY MR. JUSTICE POTTER, April 18, 1910:

Mary A. Hall of Glenburn, Lackawanna county, Pa., died on November 26, 1906, at the age of seventy-nine. Some six months prior to her death she executed what was termed an exchange deed, by which, in consideration of the assurance to her of a home and support for the remainder of her life in the old homestead, where she was born and reared, and in which she had at the time been living for many years, but which was owned by her nieces, she conveyed to two of them, Lephe Hall and Jessie Hall, the defendants herein, some twenty-two acres of land adjoining the homestead, and a piece of land in Wayne county, Pa., and certain personal property, retaining, however, to herself the control and use of all the property during her natural life. The plaintiffs, who

are the remaining heirs of Mary A. Hall, filed this bill in equity, praying for the cancellation of the said deed of exchange, alleging that its execution had been procured by the defendants by means of deception and undue influence exercised upon the said Mary A. Hall. The question for consideration here, is whether the testimony warrants the conclusion that Mary A. Hall was induced to make the deed by deception on the part of the defendants, or whether the influence exercised over her by them was sufficient to destroy her free agency in the making of the deed, so that in its execution she was dominated by the will of the defendants, and was not giving expression to her own will and judgment.

The defendants are daughters of William C. Hall, a brother of the grantor. The homestead in question, consisting of an old mansion and some twenty-five acres of land, was devised to William C. Hall by his father, who died in 1865. The devise was subject to a provision that Mary A. Hall should have rooms and a home in the homestead, so long as she remained single. She lived there until the year 1870, when she was about forty-three years of age. She then, for some reason which does not appear, left the homestead, and signed a receipt in full of all claims against the estate of her father. For some twenty-two years she made her home elsewhere. Upon the brother's death in 1892, she returned to the homestead which had then passed into the ownership of her brother's three daughters, Lephe, Jessie and Harriet. From that time until her death, it appears that Mary A. Hall made her home with the defendants most of the time. She was very much attached to them, and especially to Lephe Hall, who seems to have been her favorite niece, and was happy in her care and companionship. She was much attached to the old homestead, and cherished the hope of spending her declining years there, undisturbed. Her niece Lephe enjoyed the full confidence of her aunt, and was intrusted with the care of such of her correspondence and business as required attention. She was consulted by the aunt in her money matters, and was familiar with her property, and its final disposition was often discussed between them. It appears from the evi-

dence that during the summer of 1905, the two defendants, Lephe and Jessie Hall, and their sister Harriet, then Mrs. Shoemaker, and the aunt, Mary A. Hall, were all at the home place together. The defendants desired the aunt to make a will, but she was averse to doing so. She, however, intimated plainly her intention of giving to these nieces the most of her estate. At times during the latter years of her life the old lady was given to understand that the needs of the owners of the homestead property would require them to dispose of it. Any suggestion of a sale of the property grieved the aunt, and called forth her protests. During the year 1905, when the nieces and the aunt were together, it was suggested that the old homestead be sold, and a smaller place bought, where the aunt could have her home with one or both of the defendants. The suitability of several houses for that purpose was discussed, and finally Lephe Hall said, "Aunt Mary, why don't you buy the old homestead, you can afford to own it, and we can't." And the aunt replied, "I would if I could sell my real estate." Lephe Hall further testifies that some efforts were made to sell the aunt's real estate, without avail, and afterwards she said, "Aunt Mary, if you can't sell the real estate, why not exchange; you take ours, and we will take yours;" and that seemed to impress her very favorably. In the spring of 1906 Lephe Hall and her aunt were at home together. Jessie Hall was in New York and Mrs. Shoemaker was in Chicago. There is evidence tending to show that at that time all the owners felt that a sale of the homestead was very desirable, and the married sister, Mrs. Shoemaker, and her husband, were particularly insistent upon a sale of the property.

The trial judge found that the mental capacity of Mary A. Hall was not impaired, but he reached the conclusion that she was induced to execute the deed by a misrepresentation made by Miss Lephe Hall as to the immanence of a sale of the homestead. He placed much stress upon the reported prospect of a sale to one particular person, George Hall, which did not materialize. We are at a loss to see why so much emphasis should have been placed upon this one instance; for,

without question, the owners of the property had the right to sell it at public or private sale, or in any way that suited them, without regard to any possible right which Mary A. Hall may have had to retain rooms in the property during the remainder of her life. Whether or not she had such a right is doubtful, but evidently she did not want to remain there without the care and attention which had been bestowed upon her by her favorite niece. We have carefully examined the testimony in this respect, and we do not see that it justifies in the slightest degree any imputation of bad faith upon the part of Lephe Hall, in her dealings with her aunt, Mary A. Hall. Turning to the deed in question, we find that it recites the fact that Mary A. Hall was then residing with her niece Lephe Hall, in the old homestead, which was owned by and in the possession of the heirs of William C. Hall. And it further sets forth that Mary A. Hall desired that said property should be her home during the balance of her life; and further states that, "Whereas, a sale of said property is contemplated by the heirs of William C. Hall, to prevent the sale and retain the said homestead as her home, during the term of her natural life, Mary A. Hall desires to have the said homestead conveyed to her by the heirs of William C. Hall." It is further set forth that, "In consideration of retaining her home and support at the old Hall homestead and all expenses and repairs being paid for her, the said Mary A. Hall agrees to convey to Lephe A. Hall and Jessie Hall, two of the heirs of William C. Hall, all of the real estate and property of the said Mary A. Hall, the possession and control, however, of the property of Mary A. Hall to continue during her natural life, but the possession and control of the old homestead shall at once vest in Mary A. Hall and continue during her lifetime." And to carry out this arrangement Lephe Hall, Jessie Hall and Harriet Shoemaker, joined by her husband, conveyed to Mary A. Hall for the term of her natural life the whole of the old homestead, comprising about twenty-five acres of land, with the house, barn and outbuildings. It will be noted that all expenses and repairs were to be paid for Mary A. Hall, and she was to be supported in the home thus provided for her.

No slight burden was assumed in thus agreeing to provide the care and attention necessary for an old lady, as she then was, but with a reasonable prospect of life for some years to come. By agreement of counsel at the hearings, much testimony that would otherwise have been incompetent, was admitted. Thus Lephe Hall was permitted to testify to conversations which she had with her aunt. She states frankly that she told her aunt of the desire and need of herself and sisters to make sale of the homestead property. The subject was discussed between them many times. The efforts that were made to obtain a purchaser were made known to the aunt. Lephe Hall gave in detail the circumstances which led her to believe and report to her aunt that a cousin, George Hall, would buy the place. But nothing came of that expectation. We see nothing, however, in the testimony as to this transaction, to indicate that Lephe Hall was not honestly under the impression that George Hall was a prospective purchaser. But there was no reason for laying special stress or emphasis upon his connection with the affair. He was only one of several possible purchasers of whom mention was made. Certainly the owners of the property had the right to sell it upon terms satisfactory to themselves. And if they testified to their intention of selling the place, and the need they felt for disposing of it, who can successfully assert that the owners had no such intention, and that no sale of the property was contemplated by them? Nor does the establishment of the fact that they contemplated selling, depend upon the testimony of Lephe Hall alone. George Davidson, the attorney for Mary A. Hall, testified that he knew the Shoemakers were insisting that the place should be sold, and that they threatened to start partition proceedings to obtain the value of their interest, unless the place was sold. He states also that Mary A. Hall herself spoke to him more than once about it, telling him that Lephe was trying to sell the place. It is impossible to read the testimony in this case without drawing from it the conclusion that, throughout a period of months or years, a considerable agitation with regard to the sale of the homestead property was going on, and that Mary A. Hall knew of it, and was disturbed by it. It was

perfectly natural that some plan should be sought, which would satisfy the desire of the old lady to remain in the homestead undisturbed, and at the same time justify the defendants in making the pecuniary sacrifice which this would involve. Defendants, through their counsel, express their entire willingness to have their relationship to Mary A. Hall regarded as one of confidence and trust, and they strongly maintain that standing in that relation, the evidence shows nothing in the nature of deception, or the exercise of undue influence in procuring the assent of Mary A. Hall to the arrangement in question, or in getting her to execute the exchange deed. They concede that the burden of showing entire fairness in the transaction was upon them, and they maintain that they have under the evidence, fully sustained that burden. We agree with them in that contention. We find nothing in the testimony to warrant any other conclusion than that Lephe Hall acted with entire fairness and candor towards her aunt, and made her fully acquainted with all the facts necessary to a full understanding of the transaction.

The deed of which complaint is made was prepared by a member of the bar, Mr. George Davidson, a nephew of Mary A. Hall. He had been her legal adviser for many years, and her counsel in business affairs, as well as in matters of law. He testified that, after preparing the deed, at the request of Miss Lephe Hall, he took it to Mary A. Hall and read it over to her, and asked her if that was what she wanted. "Yes," she said, "I think it is; I will consider this, I will look it over." She then sat down and studied it carefully for perhaps an hour. They then had dinner, and afterwards Miss Mary A. Hall said that she had looked the deed over carefully, and that it was all right, and she desired to execute it; and she accordingly did so. He testified that he saw her repeatedly during the months afterwards, before her death, and that she always expressed herself as entirely satisfied with what she had done. He testified that she used to say, "I am pleased that this property is mine; Lephe has promised to stay with me as long as I live, she is going to do all of my business and look after everything for me."

Without unduly prolonging this discussion, it is sufficient to say that a careful examination of the evidence in this case has satisfied us that the deed in question was the voluntary act of Mary A. Hall, free from any undue influence by the defendants. We have no doubt under the evidence, but that she was influenced to enter into the arrangement proposed, by her desire to secure and retain for her own comfort the undisturbed possession of the property which for so many years had been her home. Probably her affection for the nieces who had cared for her in the past, and who agreed to minister to her in the future, had also something to do with it. That this element should have some weight with her would be but natural. But that she was moved to act in the matter through any deception, or through the exercise of such influence by the defendants as destroyed her free agency, or led her to act against her own will, we cannot find from the evidence.

The sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth assignments which specify error in the conclusions of law of the court below, are sustained.

The decree of the court below is reversed and it is ordered that the bill of plaintiffs be dismissed. The costs in the court below, and upon this appeal, to be borne by the appellees.